IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON  DIVISION

Robert J. Robinson, M.D.,           )    Civil Action No.  2:13-cv-1916-RMG-WWD
                                    )
                         Plaintiff, )
                                    )
            vs.                     )    __REPORT AND RECOMMENDATION__
                                    )    __OF MAGISTRATE JUDGE__
                                    )
Carealliance Health Services d/b/a  )
Roper St. Francis Healthcare; Bon   )
Secours St. Francis Xavier Hospital, Inc.;)
Franklin C. Fetter Family Health Center, )
Inc.; Steven Shapiro, M.D.; Allen Carroll; )
and Laura Celia,                    )
                                    )
                        Defendants. )


This  matter  is  before  the  Court  upon  the  Defendants'  motion  to  dismiss  the

Plaintiff's ADA claim and/or all of the Plaintiff's state law claims.  In the alternative, the

Defendants move for a stay of the Plaintiff's claims pending completion of a peer review

process by St. Francis Hospital.  [Doc. 46.]   Although the Plaintiff's submissions to this

point and related to the present motion to dismiss have all been counseled, the Plaintiff

is currently proceeding pro se in this matter.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A),

and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination

cases are referred to a United States Magistrate Judge for consideration.

## __BACKGROUND__

The  Plaintiff  is  an  OB/GYN  who  has  been  in  practice  in  Charleston,  South

Carolina since 1979.  (Second Amend. Compl.¶ 12.)  During that time, he has held full

Medical Staff Privileges at Roper Hospital and St. Francis Hospital, and he has delivered thousands of babies and performed thousands of gynecologic procedures at these two hospitals. *Id.* ¶ 15. The Plaintiff is not an employee of the Defendants; rather, like many members of the medical staff, he is a private practitioner who maintains medical staff privileges to enable him to perform OB/GYN services at the Hospital. (Second Amend. Compl. ¶ 12, 15-16). The Defendants also had a separate independent contractor relationship with the Plaintiff to provide coverage for patients admitted to the Hospital while in labor who either do not have their own OB/GYN or otherwise need the services of an OB/GYN. *Id.* ¶ 28.

For several years, the Plaintiff has been diagnosed with diabetes, a disability as defined by the ADA. *See* 29 C.F.R. §1630.2 (h)(1); (*see also* Second Amend. Complaint ¶ 17).

In the spring of 2011, allegedly as a result of his diabetes, the Plaintiff suffered a Charcot fracture to his left foot requiring external fixation surgery and the insertion of pins in his foot and leg. *Id.* ¶ 17. After surgery, he worked at Roper Hospital using a rolling stool when necessary in the delivery room. Between June and December 2012, with the benefit of this accommodation, the Plaintiff alleges that he performed dozens of Caesarians during this time with no complaints and no adverse complications to any patient or baby. *Id.* ¶ 18.

In February 2013, the Plaintiff was informed that he would no longer be allowed to use a stool during deliveries or other procedures, despite the Defendants' prior

approval of this medically necessary accommodation.  Upon information and belief, beginning in late 2012 and early 2013, a number of individuals at Roper and St. Francis hospitals conspired to force Dr. Robinson out of practice so that St. Francis or Roper Hospital employed physicians (either direct employees of St. Francis or members of its wholly owned physicians practice, Roper Physician Partners) would get the Plaintiff's payments for admissions, deliveries, and other procedures that would have otherwise been performed by Dr. Robinson. *Id.* ¶ 23.  These named individual Defendants sought to "jerk" his Medical Staff Privileges based on pretextural and manufactured concerns regarding his disability and previously agreed upon accommodations.  *Id.*

On February 7, 2013, the Plaintiff performed a very complicated delivery. (Second Amend. Compl. ¶ 32; *see also* Letter from Dr. Alexander Smythe, II, dated February 3, 2014 ("Smythe Letter," Def. Mot. Dismiss at 1).)  On February 14, 2013, a report was submitted to department chair, Dr. Victor Weinstein ("Weinstein"), raising significant clinical concerns about the Plaintiff's ability to safely perform the procedure. (Second Amend. Comp. ¶ 39; Def. Mot. Dismiss Ex. B). According to the report, the Plaintiff's inability to stand precluded him from adequately visualizing the surgical field, delivering the baby, controlling the mother's breathing, or closing the surgical wound. *Id.*

By letter dated March 25, 2013, the Medical Executive Committee (MEC), acting through the Chief of the Medical Staff, Dr. Jeffery Rieder ("Rieder"), apprised the Plaintiff that an Ad Hoc Committee had identified "several medical issues that may have an effect on [his] ability to practice" and that additional information was needed to

3

"clarify these issues." (Second Amend. Compl. ¶ 41; Rieder Letter, Def. Mot. Dismiss Ex. D.) In light of these concerns, the MEC requested that the Plaintiff apply for a medical leave of absence while the investigation continued, which he did. (Second Amend. Compl. ¶ 43; Def. Mot. Dismiss Ex D.)

The Plaintiff has indicated that the MEC identified various requirements for his reinstatement, which he alleges to have satisfied.  (Second Amen. Compl. ¶¶ 54-55.) The Defendants contend that the Plaintiff has refused to attend a three-day program at the Competency Advancement Program of the University of Florida in Gainesville ("CAPUF") or to propose any alternative program of similar rigor to justify his reinstatement.

By all representations, the investigation and peer review process of the MEC remains open, even to this time.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief.  In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff.  *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)(citations omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state "a plausible claim for relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Stated differently, "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting FED. R. CIV. P. 8(a)).

## DISCUSSION

The Defendants seek dismissal of the Plaintiff's Americans with Disabilities Act claim, or in the alternative a stay of the case, because (1) Title III does not apply to the revocation of his medical privileges; (2) the "primary jurisdiction" doctrine controls; (3) his claim is not ripe; and (4) they enjoy qualified immunity pursuant to the Healthcare Quality Improvement Act. The Court will address each basis in turn.

## I. Title III of the Americans With Disabilities Act

The Defendants first contend that Title III of the ADA does not apply. Title III states: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). "A person alleging discrimination under Title III must show (1) that he is

disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999); *see also Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir.1997) (combining the third and fourth elements as, "defendants either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability"). The term "public accommodation" is defined in terms of categories of facilities leased or operated by private entities, including hospitals. *See* 42 U.S.C. § 12181(7)(F).

There is some controversy over whether Title III applies to medical staff physicians, like the Plaintiff, or only to customers and clients. The Defendants claim the latter arguing that Title III does not extend to the Plaintiff because he was not denied any privileges or accommodation that the hospital offers to its customers or clients. The Fourth Circuit Court of Appeals has not addressed the question, and the United States Supreme Court has addressed the question only in dicta. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001). Other courts, however, have expressly held that Title III is limited to customers and patrons of the public accommodation, and does not extend to employees or contractors of those public accommodations on the basis of their

6

employment or contract. "Title III is most reasonably construed to mean the goods, services and facilities offered to customers or patrons of the public accommodation, not to individuals who work at the facility, whether those workers be paid employees, independent contractors, or unpaid volunteers." *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 268 F. Supp. 2d 1281, 1291 (D. Kan. 2003); *see also Bhan v. Battle Creek Health Sys.*, 2013 WL 1768461 (W.D. Mich. Apr. 24, 2013); *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 394 F. Supp. 2d 1134, 1144 (W.D.S.D.2005) (finding a doctor with hospital privileges did not qualify as an "individual" for purposes of Title III because he was not a client or customer), *mooted by* 450 F.3d 338 (8th Cir.2006); *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 268 F. Supp. 2d 1281, 1293 (D. Kan. 2003) (finding the Third Circuit's interpretation of Title III in *Menkowitz* unpersuasive because (1) such interpretation rejects the historical understanding that public accommodations laws are designed to protect customers and patrons and that (2) such interpretation injects Title III standards into employment and agency relationship questions and thereby essentially rewrites the scope of Title I coverage; "Title III is most reasonably construed to mean the goods, services and facilities offered to customers or patrons of the public accommodation, not to individuals who work at the facility, whether those workers be paid employees, independent contractors, or unpaid volunteers.");

More importantly, in *PGA Tour, Inc. v. Martin*, the United States Supreme Court did not reach the issue of whether Title III claims are limited to customers or clients of places of public accommodation because the plaintiff fit within the definition of client or

customer. But, to its analysis, it was critical to the Court that the plaintiff was a customer or client for purposes of Title III. *See Martin*, 532 U.S. at 680 n. 33.   Moreover, the majority opinion did not reject Justice Scalia's dissenting argument that individuals who work at places of public accommodation are outside Title III's scope. *Id.* at 693 (Scalia, J. dissenting) (interpreting the structure of the ADA, the text of Title III, and the Department of Justice regulations promulgating Title III to extend to customers of a public accommodation but not employees).   This decision has greatly informed subsequent lower court decisions on the issue, as cited above.

As discussed, the Plaintiff is not an employee of the Defendants; rather, like many members of the medical staff, he is a private practitioner who maintains medical staff privileges to enable him to perform OB/GYN services at the Hospital. (Second Amend. Compl. ¶ 12, 15-16). The Defendants also had a separate independent contractor relationship with the Plaintiff to provide coverage for patients admitted to the Hospital while in labor who either do not have their own OB/GYN or otherwise need the services of an OB/GYN. *Id.* ¶ 28.  Certainly, the Plaintiff does not contend that he was somehow a customer or client of the Defendants, in the same way the plaintiff in *Martin* did.  It appears undisputed that the Plaintiff worked at the Defendants' facilities rather than patronized them.

The Plaintiff, however, relies heavily on the Third Circuit Court of Appeals' decision, *Menkowitz v. Pottsdown Mem'l Med. Ctr.*, 154 F.3d 113 (1998), which predates *Martin*, to argue that Title III covers individuals other than clients or customers

and that a non-employee physician denied medical staff privileges by a hospital can properly bring a claim against such hospital under Title III. The district court decisions in the Sixth, Eighth, and Tenth Circuits, cited above, however, all were decided after the Supreme Court's decision in *Martin*, and declined to follow *Menkowitz*, either expressly or impliedly.   They appear to represent a more modern view of the Act's applicability that the most reasonable characterization of Title III is as a prohibition against discrimination extending to customers or clients of the public accommodation, but not employees or independent contractors on the basis of their employment. In light of *Martin* and other persuasive, subsequent consideration, the, undersigned would recommend dismissal of the Plaintiff's Title III claim.

## II.     Primary Jurisdiction

Alternatively, the Defendants contend that the court, pursuant to the "primary jurisdiction" doctrine, should dismiss the Plaintiff's ADA claim or stay the case during the pendency of the hospital's peer review process. The primary jurisdiction doctrine applies where a court has jurisdiction over a claim or set of claims, but where adjudication of those claims "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 63–64 (1956). The doctrine may be invoked and the matter may be referred to an administrative agency when the agency is "best suited to make the initial decision on the issues in dispute,

even though the district court has subject-matter jurisdiction." *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 31 F.3d 1184, 1186 (D.C. Cir.1994). Dismissal is not required. Rather, the court may "suspend the matter pending agency resolution." *Lipton v. MCI Worldcom, Inc.*, 135 F.Supp.2d 182, 190 (D.D.C. 2001). The doctrine, however, should be invoked sparingly. *See United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984).

As at most hospitals, apparently, St. Francis's medical staff is a professional society of licensed physicians governed by a set of written Bylaws. (Medical Staff Bylaws, Def. Mot. Dismiss Ex. A). The Bylaws establish a Medical Executive Committee ("MEC"), which is authorized to act upon reports concerning the quality and appropriateness of patient care, initiate investigations, and pursue corrective action against members of the medical staff to encourage competent clinical performance. *Id.* Art. XV.  The quality of medical care in RSFH hospitals is maintained and supervised by and through its medical staff in accordance with the Bylaws but is subject to the ultimate authority of the hospital's Board of Directors. *Id.* Preamble.  Among other things, the Bylaws expressly permit the MEC to suspend or impose conditions upon a staff member's privileges. *Id.* Art. X. The Bylaws further permit corrective actions for substandard clinical performance, to and including revocation of privileges. *Id.* Art. X. As stated, allegations regarding the Plaintiff's performance issues were referred to the MEC.

Courts, however, have found the applicability of the primary jurisdiction doctrine

especially dubious in cases involving simply peer review committees, as the MEC. *See Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002); *Salamon v. Our Lady of Victory Hospital*, 867 F. Supp. 2d 344,361 (W.D.N.Y. 2013) (holding that the doctrine of primary jurisdiction does not preclude a plaintiff physician's employment claims based on discrimination); *Wahi v. Charleston Area Med. Ctr.*, 2004 WL 2418316 (S.D.W. Va. Oct. 27, 2004). The United States Supreme Court has described the primary jurisdiction doctrine as "a principle . . . that in cases raising issues of fact not within the conventional expertise of judges or cases requiring the exercise of administrative discretion, agencies *created by Congress* for regulating the subject matter should not be passed over.*" Far East Conference v. United States*, 342 U.S. 570, 574–75 (1952) (emphasis added). Essentially, the primary jurisdiction doctrine is a discretionary tool that allows a court to refer certain complex factual questions to an administrative body for an initial determination. *See, e.g., Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290 (1976) (stating that "it may be appropriate to refer specific issues to an agency for initial determination" if that referral would promote uniformity or take advantage of agency expertise).

The Supreme Court has developed a two-part test for determining when to apply primary jurisdiction. Under the first prong, a district court must consider whether referral of the case to an administrative body will promote national uniformity in the field of regulation. *See Tassy*, 296 F.3d at 68. Under the second prong, the court must consider whether factual development of the case will benefit from agency expertise. *Id.*

11

Under the first part of the primary jurisdiction test, a court must consider whether deferral would promote "uniformity and consistency in the regulation of business entrusted to a particular agency." *Far East Conference*, 342 U.S. at 574. As an initial matter, this prong assumes the existence of a single regulatory body with broad jurisdiction. In this case, however, "there is simply a peer review committee established by the hospital itself." *See Wahi*, 2004 WL 2418316.  These localized peer review committees do not in isolation serve the policy of uniformity and consistency contemplated.  *See id.*  To that end, this case involves neither a regulatory scheme nor a rate structure. *See id.*  Instead, this case simply "presents a unique and narrow factual dispute that poses no risk of inconsistent interpretations" of any broadly applicable rule or policy, the desire for uniformity does not support the application of the primary jurisdiction doctrine.  *Tassy*, 296 F.3d at 69.

The Defendants contend that the MEC is part of an administrative scheme established by Congress through the enactment of the Healthcare Quality Improvement Act (HCQIA), 42 U.S.C. §§ 1111-12, which is further made imperative by various state statutes.  In effect, the Defendants contend that the HCQIA creates a myriad of miniature peer review agencies at hospitals around the country, and that each of these mini-agencies should be entitled to deference under the primary jurisdiction doctrine. Although Congress has clearly embraced the peer review process through its enactment of the HCQIA, courts have disagreed that it has created the type of regulatory scheme traditionally designed to foster national uniformity, in satisfaction of

the first prong. *See Tassy*, 296 F.3d at 69 ("The concern for consistency and uniformity is more prevalent in cases involving issues of broad applicability such as the reasonableness of rates or tariffs."); *Wahi*, 2004 WL 2418316.

The Plaintiff also emphasizes South Carolina's expressed policy interest in the peer review process insofar as participants are afforded qualified immunity, *see* S.C. Code Ann. § 44-7-3905, and a confidentiality privilege applies, S.C. Code Ann. § 44-7-392.  But, other courts have rejected peer review committees as sufficient agencies even where the state statutes required referral to them and were otherwise more robustly mandating than those that exist in South Carolina. *See Tassy*, 296 F.3d at 69-70 (considering New York law that requires a physician who seeks restoration of his staff privileges to file a complaint with the New York Public Health Council (PHC) before pursuing the claim in court.); *Salamon*, 867 F. Supp. 2d at 361.  The Court disagrees that referral to the MEC serves any serious consideration in national uniformity or consistency.

Under the second prong of the primary jurisdiction analysis, the fundamental inquiry is whether a court should refer difficult and important questions of fact to an administrative agency for an initial, non-binding determination. *See Tassy*, 296 F.3d at 68. Again, "the lack of a true administrative body counsels against applying primary jurisdiction." *See Wahi*, 2004 WL 2418316 at *3.  And, even though consideration of the Plaintiff's accommodation will require some consideration of technical incompetence the Court is not persuaded that a determination of the Plaintiff's need to sit during surgery

13

would necessarily be beyond the "conventional expertise of judges." *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir.1996).

In its discretion, the Court would not recommend applicability of the doctrine to stay this case or dismiss the claim.

## III.    Ripeness

The Defendants also contend that the Plaintiff's ADA claim is simply not ripe for the present pendency of the peer review process.  But, the ADA claim became ripe at the time the Defendants allegedly discriminated against him. *See Griffith v. Corcoran District Hospital*, 2010 WL 1239086 at *27 (E.D. Ca. March 25, 2010) (citing *Menkowitz v. Pottstown Memorial Medical Center*, 154 F. 3d 113 (3rd Cir. 1998)).  Indeed, to determine the date on which the statute of limitations begins to run for discrimination claims, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (emphasis in original; quoting *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir.1979)).  Moreover, it is well established that Title III, unlike Title I of the ADA, does not require administrative exhaustion. *See McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138 (2d Cir. 2007).  The Plaintiff's ADA claim is justiciable.

## IV.    HCQIA Immunity

Last of all, the Defendants contend that they are entitled to immunity under the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101 *et seq.*  As an initial matter,

14

the Plaintiff appears to only have sought declaratory and injunctive relief in his ADA claim.  (Second Amend. Compl. ¶ 63.)  HCQIA immunity is limited to suits for damages; there is no immunity from suits seeking injunctive or declaratory relief. *See* 42 U.S.C. § 11111(a)(1); *see Sugarbaker v. SSM Health Care*, 190 F.3d 905, 918 (8th Cir. 1999). But, even to the extent monetary damages are sought, immunity is unavailable. The HCQIA states, inter alia, that the immunity provided therein does not apply to "damages under any law of the United States or any State *relating to the civil rights of any person or persons*, including the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq. . . . ." 42 U.S.C. § 11111(a)(1)(D) (emphasis added).  The Plaintiff has specifically alleged discrimination in the Defendants' purported failure to accommodate and the peer review process, itself.  (Compl. ¶¶ 56-69.)

Based on the allegations of the Complaint, the Court cannot recommend that the Defendants enjoy any immunity under the HCQIA, at this time.

## V.    State Law Claims

Having recommended dismissal of Plaintiff's federal claim against the Defendants, the Court should decline to exercise jurisdiction over the state law claims the Plaintiff has pled against the Defendants.   *See* 28 U.S.C. § 1367(c); *see, e.g., Patterson v. City of Columbia*, 2003 WL 23901761, at *5 (D.S.C. Dec 29, 2003) ("Patterson has raised various state law claims against all Defendants. Because the federal claims must be dismissed, the court declines to exercise jurisdiction over the remaining state law claims.") They are dismissed without prejudice for refiling in state

15

court.

It appears that the Plaintiff may allege that this Court has exclusive jurisdiction over claims against Defendant Franklin C. Fetter Family Health Center, Inc. ("Fetter") because of its status as a Federally Qualified Health Center ("FQHC"). (Second Amend. Compl. ¶ 10). As the Defendants acknowledge, it is true that the United States may, under certain circumstances, seek to be substituted as defendant for an FQHC and that federal district courts have exclusive jurisdiction over claims against the United States. *See* 42 U.S.C. § 233(g) & 26 U.S.C. § 2679. No such substitution has apparently occurred. Accordingly, Fetter's presence, alone, as a defendant is not any independent basis for federal jurisdiction, as far as the Court understands.

The Plaintiff's state law claims should be dismissed without prejudice.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that the Defendants' motion to dismiss [Doc. 46] should be GRANTED. The Plaintiff's claim pursuant to Title III of the Americans with Disabilities Act should be dismissed *with prejudice*. The Plaintiff's various state law claims should be dismissed *without prejudice*.

IT IS SO RECOMMENDED.

WALLACE W. DIXON
UNITED STATES MAGISTRATE JUDGE

August 5, 2014
Charleston, South Carolina

**The Plaintiff's attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).