IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| Robert J. Robinson, M.D., | ) | Civil Action No. 2:13-1916-RMG-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Care Alliance Health Services, d/b/a | ) | |
| Roper St. Francis Healthcare; Bon | ) | |
| Secours St. Francis Xavier Hospital, Inc.; | ) | |
| Steven Shapiro; Allen Carroll and | ) | |
| Laura Celia | ) | |
| | ) | |
| Defendants. | ) | |

This action was originally filed by the Plaintiff on July 12, 2013 asserting several causes of action against numerous Defendants. Plaintiff is now on his Second Amended Complaint, which contains Nine Causes of Action. Only Plaintiff's First Cause of Action, which alleges a violation of Title III of the Americans with Disabilities Act (ADA), asserts a federal claim. The remainder of Plaintiff's Causes of Action are all pendant state law claims.

Pursuant to a Stipulation of Dismissal filed January 28, 2014, the Defendant Franklin C. Fetter Family Health Center, Inc. was dismissed as a party Defendant. As a result of this stipulation of dismissal, Plaintiff's Seventh Cause of Action (a breach of contract claim against the

1



Franklin C. Fetter Family Health Center, Inc.) was also dismissed. The remaining Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on December 1, 2014. Plaintiff filed a response in opposition on December 18, 2014, in which Plaintiff, inter alia, conceded and withdrew his Third Cause of Action (breach of contract claim against Defendant Bon Secours St. Francis Xavier Hospital, Inc. - hereinafter "St. Francis"), Fourth Cause of Action (claim for tortuous interference with a contract against the Defendant St. Francis), and Sixth Cause of Action (claim for unjust enrichment against St. Francis). Plaintiff opposes summary judgment on his remaining Causes of Action. Defendants filed a reply memorandum on January 12, 2015.

The Defendants' motion is now before the Court for disposition.[1]

### Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.



# I.

## (Background and Evidence)[2]

Plaintiff is an OB/GYN who has been in practice in Charleston, South Carolina since 1979. Second Amended Complaint, ¶ 12. During that time, Plaintiff has held full medical staff privileges at Roper Hospital and St. Francis Hospital, where he has performed thousands of gynecological procedures and deliveries. The Defendant Care Alliance Health Services d/b/a Roper St. Francis Healthcare (hereinafter RSFHC) is alleged to be the "sole member" of St. Francis Hospital and provides executives who manage both St. Francis and Roper Hospitals. The Defendant Steven Shapiro is alleged to the be President of Medical Affairs and Chief Medical Officer of RSFHC, the Defendant Allen Carroll is alleged to be the Chief Executive Officer of St. Francis, and the Defendant Laura Celia is alleged to be the Service Line Director for Women's and Children's Services at St. Francis. Id., ¶ ¶ 5-6, 8.

Plaintiff has Type II diabetes and is insulin dependant. Plaintiff's Deposition, p. 88. Plaintiff testified that his diabetes is well managed, that he has never had any visual deficiency with regard to his diabetes, nor has he ever had any symptom of hypoglycemia or had what is referred to as a hypoglycemic episode (where the individual could become dizzy or faint due to an imbalance of sugar). Plaintiff's Deposition, pp. 83, 88-90, 93-94, 96, 183, 202). However, another symptom of diabetes is foot fractures, and Plaintiff concedes that he suffered a severe fracture in his left foot in 2012 that required surgery. Plaintiff's Deposition, pp. 181-183; see also Plaintiff's Affidavit. Plaintiff was restricted to a wheelchair immediately after this surgery, following which he wore a

---

[2]The facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

progression of orthotics, boots, supports, and special shoes. Plaintiff testified that this condition substantially limits him in his ability to walk and stand, and that sometimes he has to sit on a stool when he is in surgery. <u>Plaintiff's Deposition</u>, pp. 181-184. Plaintiff further testified that this is a disability for which he needed an accommodation of being able to continue to use a stool while he operates. <u>Plaintiff's Deposition</u>, p. 110. Plaintiff testified that his condition does not mean that he cannot stand; rather, he stands when he has to and "when the baby is ready, I stand up, I get the baby out, I sit down". <u>Plaintiff's Deposition</u>, p. 224. In any event, he also testified that since he is 6' 6", he has used a stool when handling deliveries for thirty years. <u>Plaintiff's Deposition</u>, p. 111.

The Defendant Laura Celia also confirmed during her deposition that it is "common practice in the delivery room . . . for a physician to deliver babies while on a stool," and that the only "problem is if a physician can't stand up when needed in the event of an emergency". <u>Celia Deposition</u>, p. 25. Celia also acknowledged that she had received a letter from the chairperson of the department, Dr. Victor John Weinstein, stating that he felt it was safe for the Plaintiff to use a stool during surgery. <u>Celia Deposition</u>, pp. 24-25. Even so, on June 13, 2012 (not long after Plaintiff's initial foot operation in May 2012) Celia prepared a letter expressing some concerns about whether or not Plaintiff could perform his job at that time because he was in a wheelchair. <u>Celia Deposition</u>, pp. 26-27. The Defendant Carroll told her not to send the letter, telling her that he would take care of the matter. Celia had, however, already talked to numerous physicians about her concerns, including Dr. Shapiro, although she never discussed her concerns with the Plaintiff. <u>See generally</u>, <u>Celia Deposition</u>, pp. 26-34. Celia was subsequently provided a letter from Plaintiff's physician stating that Plaintiff was fully mobile and able to function, and was also told by Dr. Shapiro that he had looked into the matter and that there was no concern for patient safety. <u>Celia Deposition</u>, pp.



4

35-37, 47); Shapiro Deposition, p. 60. Celia then also discussed the matter with Dr. Weinstein, Chair of the Obstetrics Department at St. Francis, following which Dr. Weinstein told Celia that he had spoken with the other doctors at Roper and that they had all said there was no problem. Celia Deposition, p. 58. Nonetheless, Celia testified that it was her subjective belief that the doctors at Roper were "covering" for the Plaintiff, and that in her opinion Plaintiff was not able to fully perform his duties. Celia Deposition, pp. 59, 61.

Thereafter, Plaintiff had a number of complaints lodged against him by several nurses, including that he had touched a surgical drape when he stumbled while sitting on his stool, that Plaintiff had improperly tied his mask, that on one occasion Plaintiff had asked a nurse to press a pedal which controlled the cauterizer he was using (implying that Plaintiff was unable to press the pedal), and that on one occasion Plaintiff took a break to get a Pepsi, following which the nurse claimed he was having a diabetic episode and had broken sterility procedures. See generally, Plaintiff's Deposition, pp. 195-196, 199, 207-208, 212; Shapiro Deposition, pp. 32-37. In response to these complaints, Dr. Shapiro asked two other physicians, Dr. Huggins and Dr. Flowers, to investigate the matter, both of whom reported that Plaintiff was fit for duty. Dr. Shapiro also asked that Plaintiff be examined by Dr. Robert Lowery, an orthopedist, who reported that Plaintiff was able to perform with no limitations. Shapiro Deposition, pp. 33, 44; see also Court Docket No. 112-2, p. 15.

At the end of 2012, a decision was made to close the delivery facility at Roper Hospital and move all of these procedures to St. Francis. Shapiro Deposition, p. 87. Plaintiff testified that he was advised by Dr. Weinstein that Carroll did not want to allow him to use a stool at St. Francis. Plaintiff's Deposition, p. 133. Plaintiff was asked to attend a meeting in Dr.



Shapiro's office on December 13, 2012, and Plaintiff testified that another physician who was going to be at that meeting, Dr. Bell, told him that Shapiro intended to "jerk" Plaintiff's privileges. Plaintiff's Deposition, p. 126. Plaintiff testified that he therefore called Dr. Shapiro's office several times to find out what the meeting was going to be about, but never got any reply. However, when he attended the meeting there were no problems indicated, and Shapiro did not have a problem with Plaintiff using a stool while in surgery. For his part, Dr. Shapiro testified that hospitals accommodate physicians who have disabilities under the ADA in the performance of their work duties, unless the issue affects patient safety. Dr. Shapiro also acknowledged that the individuals who had investigated the complaints made against the Plaintiff did not feel there was any patient safety issue, and testified that he had no problem with Plaintiff using a stool, although he preferred to characterize it as a "preference", not as an accommodation. Shapiro Deposition, pp. 37-40.

Following this meeting, Plaintiff's orthopedic doctor, Dr. Lowery, wrote a letter stating that Plaintiff had been treated by him for his foot, that Plaintiff was in good healing position, and could work without restriction. See Plaintiff's Exhibit (Court Docket No. 112-2, p. 15). Plaintiff also scheduled an examination by Dr. Barry Weissglass, an occupational medicine doctor, for the purpose of having Dr. Wiessglass do an evaluation of Plaintiff's ability to perform delivery and surgical work. Plaintiff testified that when he arrived at Dr. Weissglass' office on December 24, 2012 for his evaluation, Dr. Weissglass told him that Dr. Shapiro had called him to ask if he thought Plaintiff's situation raised ADA issues. Plaintiff's Deposition, p. 126. Following his evaluation of the Plaintiff, Dr. Weissglass provided a report in which he opined that Plaintiff had recovered well from his surgical procedure on May 14, 2012, that Plaintiff had had no hardware in place since July 25, 2012, and that since that date he had performed approximately twenty-five caesarian sections and



over fifty deliveries without the need of any special support, and that Plaintiff was having no problems standing for at least one hour at a time. Dr. Weissglass noted that while Plaintiff was currently using a removable walking boot, he would be transitioning to a more normal shoe within the next three weeks, and that Plaintiff was able to stand for one hour or more without the use of crutches. Dr. Weissglass concluded by stating that Plaintiff was currently able to meet or exceed the physical requirements to safely provide OB/GYN care to patients, and that he was capable of safely providing OB/GYN care with no limitations and with no special accommodations. See Plaintiff's Exhibit (Court Docket No. 112-2, p. 18). Dr. Shapiro concurred with both of these assessments, and at the end of December 2012 Plaintiff began admitting patients to St. Francis and performing deliveries and C-sections. Shapiro Deposition, pp. 52-54.

On February 7, 2013 Plaintiff performed a difficult caesarean section in which he was assisted by Dr. Jennifer Fisher. The difficulty of the delivery was compounded by the fact that the mother was obese. Plaintiff attests that when he was called to come to the hospital it was raining heavily, and that when he arrived at the hospital his special orthotic shoes, which did not have gripped soles, were wet and felt slippery on the floor, so he believed that being seated would give him additional stability. Plaintiff further attests that there was no stool available in the OR, so he located a rolling chair to use. See Plaintiff's Affidavit. Fisher testified that she had never seen a doctor use a stool in the operating room in this manner. Fisher Deposition, pp. 52-53. Robinson attests in some detail as to how this operation proceeded, including his request to Dr. Fisher to have her reach into the uterine cavity and to have Dr. Fisher do some post delivery stitching. See generally, Plaintiff's Affidavit.

Although post-operatively both mother and child were fine, Dr. Fisher did not believe



the operation went well. Fisher Deposition, pp. 53-56, 64-67. Fisher expressed her concerns the following day to Dr. Weinstein, who told her to write down her complaints. Fisher Deposition, pp. 12, 65. Fisher subsequently submitted a letter on February 14, 2013.[3] Defendant's Exhibit C. This letter leveled several criticisms at the Plaintiff, including that after Plaintiff determined that a caesarean delivery would be necessary, he "hobbled down hall". Dr. Fisher further noted that Plaintiff requested a stool to sit on while operating and throughout the procedure, and that he required "multiple adjustments" during the procedure so that he could get close enough to the patient to operate. She also stated that she did not think Plaintiff "could stand up to get the appropriate leverage needed to perform the delivery", and that throughout the surgery, Plaintiff "had difficulty standing when he attempted to do so". Dr. Fisher concluded her letter by stating that she did not feel Plaintiff was able to safely perform the duties required of an OB/GYN, and that he was a danger to his patients. See Defendants' Exhibit C. The anesthesiologist who assisted during this delivery, Dr. Mitchell Siegan, also provided a letter to Dr. Weinstein in which he stated that his "chief concern" was that Plaintiff was "currently physically impaired", and that he had sat on a stool throughout the entire procedure and was unable to stand. Two nurses also provided emails that were critical of the way Plaintiff conducted this procedure. See Defendants' Exhibit D.

Dr. Weinstein consulted Dr. Shapiro, who suggested an ad hoc committee be appointed to investigate the matter. Shapiro Deposition, pp. 93-94. The committee was made up of four OB/GYN doctors, including Dr. Lauren Hamilton, who was one of Dr. Fisher's partners. Even though Plaintiff had successfully completed two subsequent c-sections after the procedure at issue,

---

[3]Plaintiff had meanwhile performed two more c-sections. Fisher Deposition, p. 105; Shapiro Deposition, p. 93.



Plaintiff agreed to participate only as an assisting physician until the ad hoc committee had completed its investigation. Plaintiff's Affidavit; Weinstein Deposition, pp. 94-96. Plaintiff also wrote a letter to Dr. Weinstein on February 18, 2013 describing his conduct and the events during the delivery at issue. See Plaintiff's Affidavit, attached Exhibit 3. However, although the ad hoc committee was provided copies of the letters from Drs. Fisher and Siegan and the two nurses, Plaintiff contends that it was not provided with Plaintiff's letter setting forth his version of what had happened during the delivery. Plaintiff was, however, interviewed by the committee on March 4, 2013, along with Dr. Fisher and Dr. Siegan.

At the conclusion of its investigation, the committee issued a report to Dr. Weinstein in which it concluded that Plaintiff had performed in a "substandard" way during the caesarean delivery because "he was unable to stand during the most important parts of the procedure . . . .". The committee's report, which also criticized Plaintiff's lack of communication with Dr. Fisher about what he wanted her to be doing, was signed by Dr. Fisher's partner, Dr. Hamilton, as the Committee Chair. The report did note that Plaintiff had told the committee that he had no physical limitations that would preclude him from standing for two hours, that he had performed a caesarean since the procedure at issue which he "stood for and the case went fine", and that in the past year he had performed hundreds of deliveries including caesarean sections without complications despite having severe trouble with his foot. It was also noted that two other physicians, Dr. McLees and Dr. Gleaton, both indicated that they had worked with the Plaintiff over the past year and voiced no concerns regarding his physical ability to perform caesarean sections. Nonetheless, the committee recommended that "at a minimum", Plaintiff be reevaluated by Drs. Lowery and Weissglass to be sure that he was physically able to perform his duties. The committee report also stated that Plaintiff

9

"must be able to stand on his own for a minimum of 2 hours", and recommended that he not be allowed to sit through caesarean sections for "any period of time".[4] See Defendants' Exhibit E.

The hospital's Medical Executive Committee (MEC) thereafter met on March 21, 2013 to review and discuss the ad hoc committee report and recommendations. Although Dr. Weinstein encouraged the MEC to accept the committee's recommendations, the MEC decided to modify those conditions due to "significant concerns about [Plaintiff's] medical condition". Specifically, because the MEC was "concerned about his diabetes affecting [Plaintiff's] ability to operate". Weinstein Deposition, pp. 83-85.[5]

On March 25, 2013, MEC Chairman Jeffrey Rieder sent Plaintiff a letter stating that additional information was needed to clarify the issues raised by the ad hoc committee's report. The letter instructed Plaintiff that, within five days from the date of the letter, he was to provide Dr. Rieder with a complete list of all hospitals, physicians, and Allied Health Care providers who had rendered Plaintiff any treatment within the past five years together with the necessary HIPAA authorization. Plaintiff was also required to undergo a comprehensive physical examination within the next two weeks if it could be arranged, following which Plaintiff would receive a copy of the results of that examination. An external review (Competency Advancement Program) was also to be completed. Finally, Plaintiff was requested to apply for a medical leave of absence within ten days, with the leave request to be for a period of six weeks. Plaintiff was notified that if this leave

---

[4]The committee made several additional findings and recommendations with respect to patient care and procedures unrelated to Plaintiff's foot issue.

[5]Although Weinstein testified that he had no knowledge of Plaintiff ever having had a hypoglycemic event, this concern apparently was based on the MEC's belief that Plaintiff had at some point been hypoglycemic. Weinstein Deposition, p. 86.



was granted and lasted for more than thirty days, a report would have to be issued to the National Practitioner's Data Bank. Further, Plaintiff was told that if he failed to request this medical leave of absence within ten days, the MEC had authorized Dr. Rieder to impose an immediate precautionary suspension of Plaintiff's medical staff privileges, which would be imposed for thirty days. See Defendants' Exhibit (Court Docket No. 109-19, pp. 1-3). A follow-up letter instructed Plaintiff to request his medical leave of absence by no later than April 9, 2013. See Defendants' Exhibit (Court Docket No. 109-19, pp. 4-5).

Plaintiff testified that he felt he had no choice but to request a leave of absence, although Dr. Weinstein encouraged him to ask for only a thirty day leave, which would not be reportable to the National Practitioner's Data Bank. Plaintiff's Deposition, p. 49; Weinstein Deposition, pp. 91-92; Plaintiff's Affidavit. Therefore, on April 9, 2013, Plaintiff wrote Dr. Rieder requesting a medical leave of thirty days. See Defendants' Exhibits (Court Docket No. 109-19, pp. 6-7). However, on April 15, 2013, the MEC put Plaintiff on a medical leave of at least six weeks. Dr. Shapiro hand delivered a letter from Dr. Rieder to the Plaintiff with notice of this forced "voluntary" leave. This letter further notified Plaintiff that he was required to return the necessary materials to attend a three day program at the Competency Advancement Program by no later than April 20, 2013. This program would include an assessment of Plaintiff's functional capacity, a consult with an endocrinologist, a physical examination, a neuropsychological assessment, a competency evaluation by Plaintiff's peers, observed standard clinical examination, participation in observed obstetrical simulations, and review of randomly selected medical records. See Defendants' Exhibits (Court Docket No. 109-19, p. 8 [noting the delivery of this letter].

On April 22, 2013, Dr. Shapiro sent Plaintiff a letter in which it was noted that



Plaintiff had failed to return his HIPPA releases, the program application, or agreement "as required", and that the application deadline for Plaintiff to get into the competency program was April 24, 2013. Plaintiff was further advised that if the current assessment dates were lost, Plaintiff's medical leave would "certainly be extended by at least another 30 days". See Defendants' Exhibit (Court Docket No. 109-19, p. 8). Plaintiff did thereafter provide the HIPPA releases; however, Weinstein testified that, other than receiving a letter from Dr. Rose Gibbs (who was treating Plaintiff for his diabetes) and stating that Plaintiff's diabetes was controlled, the MEC never contacted any of Plaintiff's physicians regarding the MEC's concerns. See Weinstein Deposition, pp. 93-94, 97.

On June 12, 2013, Plaintiff's legal counsel sent a letter to the hospital's legal counsel stating that the Defendants were keeping Plaintiff from having access to St. Francis in violation of the ADA. This correspondence included a written notice from the Plaintiff terminating his "voluntary leave". Plaintiff also stated in this written notice that he would agree to have both Dr. Lowery and Dr. Weissglass examine him again within thirty days to update their December reports, stated that he would perform a caesarean operation under the observation of Dr. Weinstein, and that he would agree to do an appropriate simulation caesarean at St. Francis or MUSC, as well as provide a confidential psychiatric evaluation. Plaintiff's notice further stated that "to accommodate my disability, I request that St. Francis [allow him] use of a stool for some of my procedures, if necessary". See Court Docket No. 109-19, pp. 10-12.

Dr. Shapiro responded by letter dated June 26, 2013, addressed to Plaintiff (not Plaintiff's counsel), in which Plaintiff was advised that he remained on the medical staff, as his application for reappointment had been granted on June 5, 2013. However, Plaintiff was further advised that any physician remains on medical leave until a request is made in writing to the MEC



asking for a return to practice, and that he (Dr. Shapiro) would pass along to Dr. Rieder Plaintiff's request asking for a return to practice. Dr. Shapiro's letter indicated that Plaintiff's request would be considered at the next meeting of the MEC on July 15, 2013. Dr. Shapiro then discussed how this process usually works, versus how Plaintiff was proposing his reinstatement be handled, and also stated that Plaintiff was asking "for St. Francis to accommodate a disability that you do not identify, define, and for which no relationship to a medical condition has ever been identified." Dr. Shapiro said that it was therefore not possible to determine if Plaintiff had a condition that was a covered disability requiring any appropriate accommodation. Dr. Shapiro's letter also states that even a physician with a demonstrated, covered disability under the ADA may be excluded if that physician poses a direct threat to the health or safety of patients, and that the KAPUF Assessment (the Competency Advancement Program Plaintiff had been requested to complete) was intended in part to determine whether Plaintiff currently had the ability to safely perform the essential functions of his profession. See Defendants' Exhibit (Court Docket No. 109-19, pp. 14-16).

Plaintiff's legal counsel thereafter sent a letter to the hospital's legal counsel dated July 10, 2013 enclosing updated evaluations from both Dr. Lowery and Dr. Weissglass, as well as a letter from Dr. John Abess concerning when a confidential psychiatric evaluation could be completed. Plaintiff's counsel requested that St. Francis immediately reinstate Plaintiff's full privileges and arrange for the caesarean observation and simulation to be completed. See Defendants' Exhibit (Court Docket No. 109-19, 17-18) Defendants represent that the MEC deferred its decision based on a lack of information and requested that Plaintiff provide the documents requested two months earlier. Plaintiff then filed this lawsuit on July 12, 2013.

13

## II.

## (ADA Claim)

In his First Cause of Action, Plaintiff alleges a violation of Title III of the ADA against the Defendant St. Francis only. Plaintiff alleges that he has a disability within the meaning of the ADA that requires "minor modifications to St. Francis' operating room to accommodate his disability". Specifically, use of a stool while he operates as well as allowing nurses to carry babies to the warmer instead of Plaintiff having to stand up to do so. Plaintiff alleges that St. Francis has failed to make any effort to explore reasonable modifications to its operating room that would accommodate his disability, and has instead "wrongfully stripped Plaintiff of his staff privilege denying Plaintiff access to its operating room and medical facility solely based on his disability". Plaintiff seeks a restraining order and injunctive relief as well as his attorney's fees and costs.[6] See Second Amended Complaint, ¶ ¶ 56-63.

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of accommodation". 42 U.S.C. § 12182(a). To recover under Title III, a Plaintiff must show that 1) they are disabled within the meaning of the ADA, 2) the Defendant is a private entity that owns, leases, or operates a place of public accommodation, 3) the Defendant has a discriminatory policy or practice in effect, and 4) the Defendant discriminated

---

[6]Under Title III, Plaintiff is limited to equitable relief. See O'Conner v. Metro Ride, Inc., 87 F.Supp.2d 894, 899, n. 2 (D.Minn. 2000); Pona v. Cecil Whittaker's, Inc., 155 F.3d 1034, 1038-1039 (8th Cir. 1998); Halpern v. Wake Forest University Health Sciences, No. 09-474, 2010 WL 3057597, n. 32 (M.D.N.C. July 30, 2010)["Plaintiff could not maintain any claim for damages under Title III of ADA."]; see also 42 U.S.C. § 12188(a).

14

against the Plaintiff based on the Plaintiff's disability by failing to make a requested reasonable modification that was necessary to accommodate the Plaintiff's disability. <u>Fortyune v. Am. Mult-Cinema, Inc.</u>, 364 F.3d 1075, 1082 (9th Cir. 2004), citing <u>PGA Tour, Inc. v. Martin</u>, 532 U.S. 661, 683 (2001). <u>See</u> 42 U.S.C. § 12182(b)(2)(A)(ii). St. Francis does not dispute for purposes of summary judgment that a genuine issue of fact exists with respect to the second and third prongs of the <u>Fortyune</u> four part analysis. <u>See</u> <u>Defendants' Brief</u>, p. 11. However, St. Francis does make several other arguments for why it is entitled to summary judgment on this claim.

**Applicability of Title III to this claim**. One argument the Defendant makes is that medical staff privileges are not "goods, services, facilities, privileges, advantages, or accommodations" that are covered under Title III. However, this same argument, whether Title III applies to medical staff physicians like the Plaintiff or only to customers and clients, has already been made in this case by St. Francis in a Rule 12 motion to dismiss, and in an Order filed September 4, 2014, the United States District Judge assigned to this case ruled that Plaintiff's position as a non-employee physician with staff privileges at the Defendant's hospital does not as a matter of law preclude him from stating a claim as an individual entitled to reasonable accommodation under Section III of the ADA. <u>See</u> <u>Order</u> (Court Docket No. 97, at pp. 4-7). The undersigned has no authority to revisit that issue; rather, if St. Francis still wishes to pursue this argument, it must do so before the District Judge. <u>Cf.</u> <u>TFWS, Inc. v. Franchot</u>, 572 F.3d 186, 191 (4th Cir. 2009) [Previous rulings continue to govern the same issues in subsequent stages in the case as the "law of the case"].

**Whether Plaintiff is "disabled" within the meaning of the ADA**. With respect to the first prong of the <u>Fortyune</u> four part analysis, the ADA defines "disability" as a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual,



b) a record of such impairment, or c) being regarded as having such an impairment.[7] 42 U.S.C. §

12102(2). St. Francis argues that Plaintiff cannot establish that he is disabled within the meaning of

the ADA because he has not shown that his impairment substantially limits him in one or more major

life activities.

There is no dispute that walking and standing is a major life activity. Calef v. FedEx

Ground Packaging System, Inc., 343 Fed. Appx. 891, 897 (4th Cir. Aug. 27, 2009); see also 29 C.F.R.

§ 1630.2(i). "Working" is also a major life activity. Jacobs v. N.C. Administrative Office of the

Courts, 780 F.3d 562, 572 (4th Cir. 2015). As for the term "substantially limits", this is "not meant

to be a demanding standard". Rather, an impairment is a "disability" if it "substantially limits the

ability of an individual to perform a major life activity as compared to most people in the general

population. An impairment need not prevent, or significantly or severely restrict, the individual from

performing a major life activity in order to be considered substantially limiting". 29 C.F.R. §

1630.2(j). St. Francis argues that the evidence in this case merely establishes that Plaintiff has an

impairment, not that this impairment "substantially limits" any of his major life activities. However,

considered in the light most favorable to the Plaintiff, the evidence before the Court is sufficient to

create a genuine issue of fact as to whether Plaintiff has a substantially limiting impairment under

the ADA, as well as whether he was "regarded as" having such an impairment, to survive summary

judgment.

Plaintiff testified that his diabetic condition substantially limits him in his ability to

---

[7]"After the 2008 Amendments to the ADA, "substantial limitation" need not prevent or
severely restrict an individual from performing a major life activity." Hibler v. ABC Technologies,
Inc., No. 13-512, 2015 WL 1734915 at * 3 (M.D.Tenn. Apr. 16, 2015) (citing Sapp v. Western
Express, No. 14-210, 2014 WL 7357379 at * 6 (M.D.Tenn. Dec. 23, 2014)); see also 29 C.F.R. §
1630.2(j).



walk and stand, requiring that he sometimes has to sit on a stool when he is performing his work of delivering babies or performing c-sections. Plaintiff's Deposition, pp. 181-184. It is also undisputed in the record that during the time period at issue Plaintiff has had to wear a variety of assistive foot gear, including orthotics, boots, supports, and special shoes, and while a functional examination in December 2012 found that he was able to stand for one hour or more without the use of crutches, the ad hoc committee appointed to investigate whether Plaintiff could perform his job as an OB/GYN had recommended, in part, that Plaintiff "must be able to stand on his own for a minimum of 2 hours" and that he not be allowed to sit through caesarean sections for "any period of time". See Defendants' Exhibit E. Although the record also contains evidence that Plaintiff had obtained doctors' opinions that Plaintiff was fully mobile and able to function and that Plaintiff could work without restriction; cf. Plaintiff's Exhibits (Court Docket No. 112-2, pp. 15, 18); considering the evidence in the light most favorable to the Plaintiff, a sufficient issue of fact has been presented as to whether Plaintiff was substantially limited in his major life activities of standing and working (if he was not going to be allowed to use a stool and/or be required to stand during the entire time he performed c-sections) to survive summary judgment. See 29 C.F.R. § 1630.2(j)(1) [Noting factors to be considered in determining whether an individual is substantially limited in the major life activity of working]; Harrison-Khatana v. Washington Metropolitan Area Transit Authority, No. 11-3715, 2015 WL 302820, at * 9 (D.Md. Jan. 22, 2015) ["An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting"], citing 29 C.F.R. § 1630.2 (j)(1)(i)-(ix).

        In any event, even if this Court were to accept Defendant's argument that the evidence does not establish that Plaintiff's condition meets the criteria for being "substantially limiting" under



17

the ADA, there is certainly sufficient evidence to establish a genuine issue of fact as to whether St.

Francis "regarded" Plaintiff as having a disability under ADA. See 42 U.S.C. § 12102(1)(C).[8]

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A) (emphasis added); see Laurent v. G & G Bus Serv., Inc., No. 10–CV–4055, 2011 WL 2683201, at *5–6 (S.D.N.Y. May 17, 2011)(quoting 42 U.S.C. § 12102(3)(A)), adopted by 2011 WL 2693651 (S.D.N.Y. July 11, 2011). Pursuant to this more lenient standard, plaintiff is "not required to show that the disability [s]he is perceived as suffering from is one that actually limits, or is perceived to limit, a major life activity." Darcy v. City of New York, No. 06–CV–2246, 2011 WL 841375, at *4 (E.D.N.Y. Mar. 8, 2011). Nor does plaintiff have to "show that the employer had a reasonable basis for perceiving [her] as suffering from a disability; [the statute] merely requires [her] to show that the employer did so perceive [her]." Id.

See Jordan, 928 F.Supp.2d at 605-606.

Therefore, in order for Plaintiff to meet the definition of being "regarded as" having a disability, the evidence (considered in the light most favorable to the Plaintiff for purposes of summary judgment) need only be sufficient to show that St. Francis either mistakenly believed that Plaintiff had a physical impairment that was substantially limiting, or mistakenly believed that an actual, non-limiting impairment substantially limited one or more of his major life activities. Cowsey v. University of Maryland Eastern Shore, 577 Fed.Appx. 167, 174 (4th Cir. July 1, 2014), citing Rhoads v. FDIC, 257 F.3d 373, 390 (4th Cir. 2001); Chollett v. Patterson-UTI Drilling Services, LP, No. 08-27, 2011 WL 4592378, at * 8 (S.D.Tex. Sept. 30, 2011); Wright v. Stark Truss, Co., Inc., No. 10-2427, 2012 WL 3029638, at * 7, n. 11 (D.S.C. May 10, 2012) [An individual meets the requirement of being regarded

---

[8] Whether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under (g)(1)(iii)[the "regarded as" prong]. See 29 C.F.R. § 1630.2(2); see also Jordan v. Forfeiture Associates, 928 F.Supp.2d 588, 605 (E.D.N.Y. 2013)[" plaintiff who is 'regarded as' disabled is protected under the ADA even if [he] is not actually disabled."].



18

as having a disabling impairment if the individual establishes that he or she has been subjected to an action prohibited by the ADA because of an actual or perceived impairment, whether or not the impairment limits or is perceived to limit a major life activity], adopted by, 2012 WL 3039092 (D.S.C. July 24, 2012).[9]

Here, the evidence clearly reflects that Celia believed that Plaintiff's impairment prevented him from being able to stand sufficiently to perform gynecological services in the surgery, that several nurses had implied that Plaintiff's foot problems did not allow him to control the cauterizer he was using and that on one occasion he had to take a break because he was having a diabetic episode, that Dr. Fisher and Dr. Siegan did not believe Plaintiff was able to safely perform the duties required of an OB/GYN due to his condition, and that both the hospital's ad hoc committee as well as the MEC expressed similar concerns. See generally, Celia Deposition, pp. 26-34, 59, 61); Plaintiff's Deposition, pp. 195-196, 199, 207-208, 212; Shapiro Deposition, pp. 32-37; Defendants Exhibits C, D and E; Defendants' Exhibit (Court Docket No. 109-19).

Therefore, St. Francis' argument that there is not sufficient evidence to give rise to a genuine issue of fact as to whether Plaintiff meets the definition of "disabled" under the ADA is without merit. Muhammed v. Klotz, 36 F.Supp. 2d 240, 243 (E.D.Pa. 1999)["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law!"], citing Anderson

---

[9]The Fourth Circuit has not decided whether an employer's request that an employee be evaluated is, by itself, sufficient to show that the employer "regarded" the employee as disabled for purposes of the ADA. Cowsey, 577 Fed.Appx. 174-175. However, such a finding is not necessary in this case, as the evidence is sufficient to give rise to genuine issue as to whether St. Francis regarded Plaintiff as having a substantially limiting impairment.

19



<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 247, 250-252 (1986).

**Failure to accommodate.** Since St. Francis concedes for purposes of summary judgment that it operates a place of public accommodation and has a discriminatory policy or practice in effect (the second and third prongs of the four prong <u>Fortyune</u> test), and as the undersigned has concluded that the evidence is sufficient to give rise to a genuine issue of fact as to whether Plaintiff is disabled within the meaning of the ADA (the first prong of the <u>Fortyune</u> four prong test), the Court must turn to consideration of whether the evidence is sufficient to show that St. Francis discriminated against Plaintiff on the basis of his disability by failing to make a requested reasonable modification that was necessary to accommodate Plaintiff's disability (the fourth criteria under <u>Fortyune</u>).

In order to establish this prong of the <u>Fortyune</u> four part analysis, the evidence must show that the Defendant had notice of Plaintiff's disability, that notwithstanding Plaintiff's disability he could perform the essential functions of his position with reasonable accommodation, and that the Defendant refused to make such accommodation. <u>Haneke v. Mid-Atlantic Capital Management</u>, 131 Fed.Appx. 399, 400 (4th Cir. 2005). In his Second Amended Complaint, Plaintiff alleges the modifications he needed to accommodate his disability were use of a stool in surgery when delivering babies and performing c-sections, and allowing nurses to carry babies to a warmer instead of Plaintiff having to stand up an do so. <u>Second Amended Complaint</u>, ¶ 59. St. Francis argues that Plaintiff cannot establish the fourth prong of the <u>Fortyune</u> four part analysis because Plaintiff never requested a modification, because St. Francis never denied Plaintiff his required modification, and (alternatively) that St. Francis was not required to provide Plaintiff with his proposed modification. In order to evaluate these defenses, the Court must view Plaintiff's alleged accommodation requests separately.



First, to the extent Plaintiff alleges in his Complaint that St. Francis refused to accommodate his disability by not allowing nurses to carry babies to a warmer instead of Plaintiff having to stand up to do so, the undersigned agrees with the Defendant that it is entitled to summary judgment on that claim. Plaintiff has pointed to no evidence whatsoever to show that he ever requested any such accommodation from the Defendant, or that if he did so, the Defendant refused to accommodate this request. Further, the record reflects that, at his deposition, Plaintiff was specifically asked:

> Was there any other modification [other than utilizing the stool] or any other modification that you were utilizing at that time that - - that would have been related at all to diabetes or any other limitation you might have had?"

> Answer:    I am not sure. I would say no. I am not sure about the question. Did I ask for anything besides the stool?

> Question:    Yes.

> Answer:    No

Plaintiff's Deposition, p. 215.

Therefore, this claim is without merit and should be dismissed.

With respect to Plaintiff's use of a stool in the OR, Defendant argues that Plaintiff never made a written request for this accommodation, citing to pages 213-215 of Plaintiff's deposition. However, it is clear in the record of this case that Plaintiff was having difficulties with his feet and ability to stand, including that he sometimes used crutches as well as that he had to wear special footwear, that he used a stool extensively while performing gynecological procedures and had difficulty standing for long periods of time, and that because of his condition the nurses had even named a stool after him, calling it Dr. Robinson's stool. Celia Deposition, p. 25. The record further



reflects that complaints had been made about Plaintiff using a stool in the OR, resulting in an investigation in late 2012 which found no concern for patient safety, and following which Plaintiff was allowed to continue using a stool while performing gynecological services, although Dr. Shapiro preferred to characterize this a "preference" rather than an accommodation. Shapiro Deposition, pp. 38-39, 60. Considered in the light most favorable to the Plaintiff, this evidence is sufficient to create a genuine issue of fact as to whether the Defendant had notice of Plaintiff's disability and that Plaintiff needed this accommodation to continue to perform his job. This evidence is also sufficient to establish an issue of fact as to whether Plaintiff could perform the essential functions of his position with this accommodation. Cf. Haneke, 131 Fed.Appx. at 400.

　　　　With respect to St. Francis' argument that it never denied Plaintiff his requested modification, the evidence (again considered in the light most favorable to the Plaintiff) shows that the Defendant knew that Plaintiff needed access to a stool while performing gynecological services in the OR, that it had been determined that Plaintiff using a stool in the OR did not jeopardize patient safety, and that indeed it was even a "common practice in the delivery room . . . for a physician to deliver babies while on a stool". See Celia Deposition, pp. 24-25; Shapiro Deposition, pp. 37-40, 60. Nonetheless, the Defendant Carroll did not want Plaintiff to use a stool at St. Francis (where all deliveries were to be performed after December 2012), and the ad hoc committee appointed to investigate what had occurred during the caesarean delivery presided over by the Plaintiff on February 7, 2013 recommended that, in order for Plaintiff to continue with his staff privileges at the hospital, he must not only be able "stand on his own for a minimum of 2 hours", but that he also not be allowed to sit through caesarean sections for "any period of time". Plaintiff's Deposition, p. 133; see also Defendants' Exhibit E.    The MEC, which reviewed the ad hoc committee's



22

recommendations, then further required that Plaintiff also undergo additional testing before being allowed to resume his practice at the hospital due to concerns about how Plaintiff's diabetes was affecting his ability to operate, including requiring Plaintiff to take a leave of absence of a length of time such that it might be required to be reported to the National Practitioners Data Bank.

Although the Defendant argues that if Plaintiff had completed all of these requirements he could have been allowed to return to practice at the hospital, there is no indication in any of these materials that the MEC had in any way rejected the ad hoc committee's recommendation that Plaintiff only be allowed to do so if he could stand on his own for a minimum of two hours and not be allowed to sit through caesarean sections for "any" period of time, even though it was "common practice" for physicians to use stools in the operating room and Plaintiff had previously been allowed this convenience. Therefore, the evidence is sufficient to establish an issue of fact as to whether the Defendant denied Plaintiff his requested accommodation of being able to use a stool while performing gynecological services in the OR.[10]

---

[10]As noted, Defendant does also contend that it had the right to review Plaintiff's ability to perform his job based on the complaints that were made, both as a matter of hospital procedure and in the interest of patient safety, and that if Plaintiff had simply followed the instructions provided to him for restoration of his staff privileges (which Defendant argues Plaintiff could still do), the matter may have been resolved in his favor. Instead, however, Plaintiff chose to commence this lawsuit without completing the administrative procedure provided to him, and (Defendant therefore contends) Plaintiff should not be able to proceed with this claim without completing the hospital peer review process. However, this contention, known as the "primary jurisdiction" doctrine, was presented to the Court as part of the Defendants' earlier motion to dismiss, and was rejected by the Court in its Order of September 4, 2014. See Order (Court Docket No. 97, p. 8). To the extent Defendant's argument is that Plaintiff's claim is not even "ripe" because he failed to complete the administrative review process, the District Judge has also already rejected this argument as well. See Order (Court Docket No. 97, p. 8). Therefore, these arguments for dismissal of Plaintiff's ADA claim have not been discussed or addressed herein, as these earlier rulings already deciding these separate issues are the "law of the case" for purposes of this Report and Recommendation. TFWS, Inc., 572 F.3d at 191 [Previous rulings continue to govern the same issues in subsequent stages in the case as the "law of
(continued...)



Finally, with respect to the Defendant's argument in the alternative that it was not required to provide Plaintiff with his proposed modification because it would "alter the fundamental nature of St. Francis' business" and would pose a direct threat to the health of St. Francis' patients; see Defendants' Brief, p. 13; based on the evidence before the Court, whether allowing Plaintiff his requested accommodation would pose a danger to patient health and safety is a question of fact that this Court cannot determine on summary judgment, since there is both evidence in the record showing that Plaintiff was fully capable of performing gynecological services without any problems while using a stool and that stools were even commonly used in the OR, as well as evidence that Plaintiff's ability to perform these services with his condition was deficient. Muhammed, 36 F.Supp. 2d at 243 ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law!"].

Therefore, as the evidence before the Court establishes an issue of fact as to whether Plaintiff is disabled within the meaning of the ADA; that the Defendant is a private entity that owns, leases, or operates a place of public accommodation (admitted for purposes of summary judgment); that the Defendant has a discriminatory policy or practice in effect (admitted for purposes of summary judgment); and whether the Defendant discriminated against the Plaintiff based on his disability by failing to make a requested reasonable modification to use a stool in the OR that was necessary to accommodate his disability, the Defendant is not entitled to summary judgment on Plaintiff's Title

---

[10](...continued)
the case"]. See also, discussion of applicability of Title III to Plaintiff's claim, found at p. 15, supra.

24

III ADA claim. Fortyune, 264 F.3d at 1082; PGA Tour, Inc., 532 U.S. at 683.

## III.

### (Pendant State Law Claims)

In addition to his Title III ADA claim, Plaintiff asserts several state law causes of action. In his Second Cause of Action, Plaintiff alleges a claim for abuse of process against the Defendants St. Francis, Carroll and Shapiro. In his Fifth Cause of Action, Plaintiff alleges a claim for torturous interference with contract against the Defendants RSFHC, St. Francis, Carroll, Shapiro and Celia. In his Eighth Cause of Action Plaintiff alleges a claim of civil conspiracy against the Defendants Carroll and Shapiro. In his Ninth Cause of Action, Plaintiff alleges a claim of civil conspiracy against the Defendants RSFHC and St. Francis.[11]

**Issue of immunity from damages under the Health Care Quality Improvement Act (HCQIA)**. Plaintiff seeks monetary damages in his state law causes of action. However, the HCQIA provides immunity from monetary damages for claims against individuals or professional review bodies for any actions arising out of peer review activities. This immunity applies to professional review actions based on a physician's "competence or professional conduct"; 42 U.S.C. § 11151(9); and is meant to be an "incentive and protection for physicians engaging in effective professional peer review". Id., at § 11101(5). The purpose of the HCQIA is to grant peer reviewers immunity so as to encourage physicians to engage in peer review and take actions (to include suspension and revocation of privileges if necessary) to protect patients without fear of reprisal in the

---

[11]Plaintiff's remaining state law causes of action (Third, Fourth, Sixth and Seventh) have already been dismissed or withdrawn. Further, as the Defendant Franklin C. Fetter Family Health Center, Inc. has been dismissed as a party Defendant, it is no longer a Defendant in Plaintiff's Ninth Cause of Action.

25

form of suits seeking monetary damages. Oksanen v. Page Memorial Hospital, 945 F.2d 696, 704 (4th Cir. 1991). Further, and significantly, the HCQIA provides a presumption that the peer review action at issue complied with the standards necessary for the granting of immunity under that statute. 42 U.S.C. § 11112(a); see Wieters v. Roper Hospital, Inc., 58 Fed.Appx. 40, 45 (4th Cir. 2004) [affirming summary judgment where the claimant physician "failed to rebut the presumption of the HCQIA that the hospital complied with its requirements"].

Pursuant to 42 U.S.C. § 1111(a)(1), if a professional review action of a professional review body meets all of the standards set forth in 42 U.S.C. § 11112(a), the professional review body, as well as any person participating in or assisting or acting as a member or staff of the professional review body, *shall not be* liable for damages under any law of the United States or of any State with respect to that action. See Moore v. Williamsburg Reg. Hospital, 560 F.3d 166, 171 (4th Cir. 2009).[12] 42 U.S.C. § 11112(a) provides that immunity is applicable if the peer review action at issue was taken:

1)    in the reasonable belief that the action was in the furtherance of quality health care;

2)    after a reasonable effort to obtain the facts of the matter;

3)    after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

---

[12]The only exception to this immunity from damages is that it does not apply to "damages under any law of the United States or any State relating to the civil rights of any person or persons . . . .". 42 U.S.C. § 11111(a)(1)(D). Cf. Moore, 560 F.3d at 178 ["HCQIA does not provide immunity from damages for claims made under the Civl Rights Acts."]. As such, this exception would apply to a claim asserted by a claimant under the ADA, except that Title III of the ADA (the title under which Plaintiff's claim in his First Cause of Action is asserted) does not allow for an award of damages. See n. 6, supra. Therefore, since Plaintiff's state law claims are not civil rights claims, this exception to the immunity provided under the HCQIA is not applicable in this case.

4)    in the reasonable belief that the action was warranted by the facts known after
       such reasonable effort to obtain facts and after meeting the requirements of
       Paragraph (3).

42 U.S.C. § 11112(a).

This creates an unusual summary judgment standard. A plaintiff suing over such an action must prove that the action failed to fulfill the statute's requirements. Thus, the defendant is entitled to summary judgment unless "a reasonable jury, viewing all facts in a light most favorable to [the plaintiff], could conclude that he had shown, by a preponderance of the evidence, that [the] action[ ] fell outside the scope of section 11112(a)." Gabaldoni v. Washington County Hospital Assoc., 250 F.3d 255, 260 (4th Cir.2001).

Weiters, 58 Fed.Appx. at * 5.

Plaintiff does not contest that the initiation of an investigation into his ability to provide quality patient care was appropriate due to the "strongly worded complaint" from Dr. Fisher that he was not able to provide such care, and that the review action undertaken at that time was therefore taken in the "reasonable belief that the action was in the furtherance of quality health care", the first of the four criteria provided for in § 11112(a). See Plaintiff's Brief, pp. 40-41. Rather, Plaintiff's complaint is that 1) the ad hoc committee's and MEC's requirement that he be able to stand for two hours unassisted was a denial of his request for a reasonable accommodation, that 2) the Defendants' actions in forcing him to take medical leave denied him access to an immediate hearing for at least six weeks, that 3) the Defendants improperly hired and relied on a report from Dr. Thomas Nolan as a basis for expanding its review of and requirements for Plaintiff's return to work, and 4) the Defendants' actions improperly kept control over the Plaintiff during the forced medical leave, rather than allowing this matter to be overseen by the credentialing committee, which was mandated by the hospital's bylaws. Plaintiff's Brief, p. 41. Therefore, the question before the Court is whether, in taking the actions cited by the Plaintiff, the Defendants failed to comply with ¶¶ 2-4



of § 11112(a). As noted, Plaintiff has the burden of establishing Defendants' non-compliance. Moore, 56 F.3d at 179 ["There is a statutory presumption that a professional review action meets the requirements for immunity unless the presumption is rebutted by a preponderance of the evidence"].

With respect to Plaintiff's complaint that the Defendants "kept control of" the issues involved in the investigation during his "forced medical leave", rather than allowing it to be overseen by the credentialing committee, which Plaintiff contends was "mandated by the by-laws", that is not a basis for denying the immunity afforded by the HCQIA. "Even if the procedure employed to handle [Plaintiff's] dispute strayed from the letter of the by-laws, . . . it still meets the immunity requirements if it was 'fair to the physician under the circumstances'". Wieters, 58 Fed.Appx. at 46, citing 42 U.S.C. § 11112(a)(3). Therefore, the question is whether Plaintiff has rebutted the presumption that the peer review process in his case was reasonable, not whether there was a strict compliance with the hospital's by-laws.

As for Dr. Nolan, he was not even brought into to review Plaintiff's credentials until *after* Plaintiff had already filed this lawsuit. Dr. Nolan is a board certified OB/GYN who was asked to review the record and evidence in this case by the MEC, and is the Defendants' expert witness. Pocock Deposition, pp. 88-89, 131-132. Dr. Nolan provided two expert reports, one dated November 18, 2013, and the other dated February 25, 2014. See Defendants' Exhibits (Court Docket Nos. 109-13, 109-14). Dr. Nolan also had his deposition taken. See Defendants' Exhibits (Court Docket No. 109-9). Although Plaintiff conclusorily states in his brief that the Defendants hired Dr. Nolan in order to "intentionally create [ ] a false record of disability", Plaintiff has provided no evidence to show, whether Plaintiff agrees with Dr. Nolan's opinion and conclusions or not (which he obviously does not), that Dr. Nolan has in any way submitted "false" testimony or otherwise acted improperly



in rendering an opinion in this case. Under similar circumstances, the Fourth Circuit has held that the mere allegation that the process used by the Defendants was the result of a vendetta against the Plaintiff physician was "far from sufficient to overcome the presumption [of immunity under the HCQIA] in favor of the hospital". <u>Wieters</u>, 58 Fed.Appx. at 46;[13] <u>cf</u>. <u>Monroe v. AMI Hospitals of Texas, Inc.</u>, 877 F.supp. 1022, 1028 (S.D.Tex. 1994) ["Assertions of hostility or bad faith are immaterial to reasonableness standards of § 11112(a)."].

Plaintiff's claim therefore essentially rests on his argument that the ad hoc committee's recommendation that he be able to stand for two hours unassisted was improper in that it denied him his right to a reasonable accommodation[14], and that the MEC acted improperly by forcing him to take medical leave and denying him access to a hearing for at least six weeks. The problem with Plaintiff's arguments is that he filed this lawsuit without allowing the hospital review process to play itself out.

Plaintiff does not even dispute that, in response to Dr. Fisher's complaint (which was supported by the anesthesiologist present at the C-section at issue, as well as by both of the nurses who were present during this operation), it was appropriate for the hospital to review Plaintiff's conduct as well as whether he was physically capable of continuing to perform OB/GYN services at St. Francis. Having been presented with a serious allegation that Plaintiff was not competent to perform OB/GYN services, the undersigned can not find (and certainly Plaintiff has not shown)

---

[13]In <u>Wieters,</u> this contention had even been advanced by the Plaintiff's expert witness.

[14]The "reasonable accommodation" argument is an ADA issue which has already been dealt with, <u>supra</u>. This issue is addressed in this section solely with respect to whether the ad hoc committee's findings are entitled to the HCQUIA presumption of immunity from monetary damages.



anything improper in the hospital restricting Plaintiff's access to providing these critical services pending a review of these very serious allegations. Cf. Johnson v. Christus Spohn, No. 06-138, 2008 WL 375417 at * 8 (S.D.Tex. Feb. 8, 2008) [Based upon the seriousness of the incident, the "investigation was adequate to justify its belief a temporary suspension was appropriate in the interest of protecting patients and providing time for an investigation . . . to determine the need for a professional review action.'] (internal citations omitted); Monroe, 877 F.Supp at 1028 [Noting that it is not the role of the federal courts on review of such actions to substitute its judgment for that of the hospital's governing board].  Indeed, the hospital would have potentially opened itself up to serious liability if it had not done so and Plaintiff then improperly handled an OB/GYN procedure. Plaintiff also does not contest that, when presented with these allegations, he voluntarily agreed to participate only as an assisting physician until the ad hoc committee that had been appointed to look into these allegations had completed its investigation.  Hence, the evidence reflects that Plaintiff was provided notice of these charges and that an ad hoc committee had been appointed to look into these allegations. The evidence further reflects that as part of the ad hoc committee's review of this matter Plaintiff was interviewed so as to provide the Committee with his side of the story, as were Drs. Fisher and Siegan (the anesthesiologist).  See Defendants' Exhibit E.[15]

The ad hoc committee then sent its report and recommendations to the MEC, which

---

[15]Plaintiff's separate complaint that Dr. Hamilton, who practices with Dr. Fisher, was a member of the ad hoc committee is not a basis on which to find that the hospital treated Plaintiff unfairly for purposes of HCQIA immunity. Cf., Weiters, 58 Fed.Appx. at pp. 42, 46 [Noting that fact the review body had at least one doctor who was the Plaintiff's "economic competitor" did not invalidate the review process or overcome the presumption in favor of the hospital]; Wayne v. Genesis, 140 F.3d 1145, 1149 (8th Cir. 1998) [physician's claim that two members of peer review committee were in direct economic competition with her was insufficient to rebut presumption that "peer review process was fair under circumstances."].

30

convened to review and discuss the matter on March 21, 2013. On March 25, 2013 the MEC sent a letter to the Plaintiff, with a copy of the ad hoc committee's report attached, noted the ad hoc committee's recommendations, and stated that the Executive Committee of the MEC had determined that additional information was needed to clarify the issues raised in the ad hoc committee's report. Plaintiff was asked to provide the MEC with his health care records for the MEC to review, and to undergo a comprehensive physical examination within the next two weeks, the results of which would be provided to the Plaintiff.[16] The Plaintiff's clinical and physical ability were also to be addressed by having Plaintiff undergo an external capacity assessment, which might include an observed planned caesarean section from Plaintiff's current patient population, as well as an observed simulation of an emergency caesarean section.

The MEC's letter also stated that, although the current investigation had not established whether a restriction of a privilege was necessary, a risk to patients was suspected based on the information they had been provided. For that reason, the MEC requested that Plaintiff apply for a medical leave of absence for a period of six weeks pending the investigation into his professional capability. Plaintiff was further provided notice that if his leave lasted for more than thirty days, a required report would need to be issued to the National Practitioners Data Bank. Finally, Plaintiff was notified that if he failed to request a medical leave of absence, Dr. Reider (Chairman of the Executive Committee) had been authorized to impose an immediate precautionary suspension of thirty days of Plaintiff's medical staff privileges. In the interim, the voluntary

---

[16]In light of the serious allegations regarding Plaintiff's physical ability to perform OB/GYN services and procedures, and the conflicting information provided by Plaintiff and Drs. Fisher and Siegan to the ad hoc committee, Plaintiff has not shown that it was unreasonable that he would be required to undergo a physical examination to determine whether he was physically able to continue with his staff duties.

31

temporary agreement Plaintiff had signed remained in effect. See Defendants' Exhibit (Court Docket No. 109-19, pp. 1-5).

There is nothing in this evidence which rebuts the presumption that the MEC's action to that time was being done in a reasonable effort to obtain the facts of the matter in response to a reasonable belief that the action was warranted, or that the matter was being handled in such a way as to be unfair to the Plaintiff under the circumstances. Cf. Braswell v. Haywood Regional Medical Center, 234 Fed.Appx. 47, 54-55 (4th Cir. Apr. 26, 2007)[Finding that under the circumstances, the Hospital did not violate the doctor's constitutional rights or lose its immunity under the HCQIA if the summary suspension of his privileges was necessary to protect patient safety](citing Patel v. Midland Mem. Hosp. & Med. Cen., 298 F.3d 333, 340 (5th Cir. 2002)[holding summary suspension of cardiologist's clinical privileges did not violate due process because doctor's "methods posed a danger to patient safety"] and Caine v. Hardy, 943 F.2d 1406, 1412-1415 (5th Cir. 1991)[holding that suspension of anesthesiologist's clinical privileges before formal hearing was held was constitutional]). Significantly, no final action had been taken, nor had any final decision on Plaintiff's status been made. Rather, these were all interim steps being taken to ascertain the facts of Plaintiff's condition so than an informed decision could be made. Plaintiff responded by asking for a leave of absence of thirty days (in order to keep the time period below the Doctor Bank reporting requirement); see Defendants' Exhibit (Court Docket No. 109-19, p. 6); however, he did not provide the HIPPA releases or the completed application for the program assessment, for which there was a sign-up deadline. See Defendants' Exhibit (Court Docket No. 109-19, p. 8). Rather, Plaintiff instead quickly assumed the posture of an impending litigant. Again, Plaintiff has presented no evidence to rebut the presumption of immunity afforded these actions. Cf. Osuagwu v. Gila



Regional Medical Center, 850 F.Supp.2d 1238-1239 (D.N.M. 2012) [Finding plaintiff could rebut the presumption with clear and convincing evidence that during the investigation hospital officials did not make "a reasonable effort to obtain facts" during his temporary suspension].

Instead of complying with the MEC's instructions, on June 12, 2013, Plaintiff's legal counsel wrote Defendants' counsel enclosing a draft complaint of a federal lawsuit, and notifying the Defendants' counsel that to avoid the filing of a lawsuit, St. Francis was to implement a sixty day provisional reinstatement of Plaintiff's "full medical staff privileges", during which time Plaintiff would have Dr. Lowery and Dr. Weissglass examine him to update their December 2012 findings, Plaintiff would perform a caesarean operation under the observation of Dr. Weinstein as well as an appropriate simulation test, and undergo a confidential psychiatric evaluation. Plaintiff's counsel also demanded payment of $100,000.00 for alleged costs and damages to the Plaintiff. See Defendants' Exhibit (Court Docket No. 109-19, pp. 10-12). Attached to this letter was a written termination of medical leave of absence from the Plaintiff, and asking that he be restored to full OB/GYN medical staff privileges at St. Francis on the terms outlined in his lawyer's letter. See Defendants' Exhibit (Court Docket No. 109-19, p. 13).

By letter dated June 26, 2013 from Dr. Shapiro, Plaintiff was advised that his request for a sixty provisional reinstatement of his full medical staff privileges with his additional provisos was being forwarded to Dr. Reider as chairman of the MEC, and that his request would be considered at the next meeting of the MEC on July 15, 2013. However, Dr. Shapiro also advised Plaintiff in this letter that, traditionally, demonstration of an ability to return to active practice should occur before or simultaneously with a receipt for reinstatement, not after a physician has been permitted to return from medical leave. He also reminded Plaintiff that the external capacity assessment ("CAPUF")

Plaintiff had been requested to undergo was "intended to answer reasonable questions concerning [Plaintiff's] fitness to safely practice, the nature of any limitations, whether the limitations posed a direct threat to patients, and to receive and have [Plaintiff] receive recommendations to improve patient safety and as to precise accommodations that may be appropriate". Dr. Shapiro concluded his letter by stating that "[g]iven the well documented patient safety incident that precipitated this action, the MEC reasonably believed you may pose a direct threat to patients, and thus, the referral to CAPUF [the external capacity evaluation]". See Defendants' Exhibit (Court Docket No. 109-19, pp. 14-16). Belasco v. Warrensville Heights City School Dist., ___ F.Supp.3d ___, 2015 WL 236138 (N.D. Ohio Jan. 16, 2015) ["Health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination, even if the examination might disclose whether the employee is disabled or the extent of any disability"].

On July 10, 2013, Plaintiff's counsel responded by writing a letter to Defendants' legal counsel expressing disappointment that the hospital had not responded to Plaintiff's settlement demand so as to avoid litigation as set forth in his letter of June 12, 2013, and that the "settlement demand so as to avoid litigation" must now be withdrawn. Plaintiff's counsel also attached to his letter copies of updated evaluations from Dr. Lowery and Dr. Weissglass, as well as a letter from Dr. John Abess. Plaintiff's counsel asked if St. Francis would, in light of this information, "immediately provide reinstatement" of the Plaintiff's full privileges and arrange for the caesarean simulation observation to be completed. Otherwise, counsel asked who would be authorized to accept service of the Complaint to be filed. See Defendants' Exhibit (Court Docket No. 109-19, pp. 17-18). Plaintiff thereafter filed this federal lawsuit two days later, on July 12, 2013.

There is nothing in this evidence sufficient to rebut the presumption of the hospital's



34

compliance with the requirements of §11112(a)(1)-(4).  Wieters, 58 Fed.Appx. at 45 [affirming summary judgment where the claimant physician "failed to rebut the presumption of the HCQIA that the hospital complied with its requirements"]; Monroe, 877 F.Supp. at 1038 [Finding Plaintiff failed to overcome the presumption where the actions taken were "in the reasonable belief that the action was warranted by the facts known"].  In light of the very serious allegations made against the Plaintiff by two physicians and two nurses concerning his ability to properly and safely provide OB/GYN care to patients, the hospital undertook a review action "in the reasonable belief that the action was in the furtherance of quality health care".  §11112(a)(1).  Plaintiff does not even dispute this fact.  As part of this peer review, the hospital MEC appointed an ad hoc committee to review the matter.  Plaintiff was notified of this action and agreed to participate in patient care only as an assisting physician until the committee had completed it investigation.  The committee then reviewed medical records and interviewed both the Plaintiff and the two physicians who had made the complaint, following which it submitted a report recommending that Plaintiff undergo physical evaluations by Dr. Lowery and Dr. Weissglass to be sure he was able to perform his duties along with some recommended minimum functional requirements.  The MEC notified Plaintiff of these findings and requested that Plaintiff complete a full functional evaluation by CAPUF as well as allow the committee to review his medical records.  The MEC also asked that Plaintiff take a voluntary leave of absence, but notified him that if he did not do so, an immediate thirty day precautionary suspension of Plaintiff's staff privileges would be imposed.

The Defendant argues that at this point the hospital was only trying to obtain sufficient verifiable information on which to make an informed decision about what to do in Plaintiff's case - no final decision had been made by either the MEC or the hospital.  However, as noted hereinabove,



Plaintiff did not comply with the MEC's requests, with the dispute instead quickly changing to the posture of litigation. Based on this evidence, the undersigned does not find that Plaintiff has rebutted the presumption that the actions taken to this point were a reasonable effort to obtain the facts, that he had reasonable notice of the claims being made against him and of the peer review process, that he had been able to participate in that process, or that the decision that he not continue performing OB/GYN procedures at the hospital pending the results of the peer review investigation was taken in the "reasonable belief that the action was warranted by the facts known". See §11112(a)(2)-(4).

**Post-Litigation Evidence**. The parties have also submitted numerous exhibits detailing what has transpired since this lawsuit was filed. Plaintiff was delivered a letter dated July 22, 2013 from the MEC, noting therein, in part, that the Executive Committee had requested in writing that Plaintiff arrange for both Dr. Lowery and Dr. Weissglass to appear at the Executive Committee meeting to explain the details of their assessments (which were attached to Plaintiff's counsel's letter of July 10, 2013), as well as answer questions from the MEC during its regularly scheduled meeting on July 15, 2013, but that "[u]nfortunately you or your attorneys decided not to take advantage of this opportunity to continue discussions and provide needed information to the Executive Committee". Dr. Reider's letter did state that Plaintiff's additional submissions represented "meaningful progress toward satisfying the Executive Committee's earlier request made many months past", but that "in the interest of patient care, additional information is needed before a decision can be reached". Plaintiff was asked to provide the results of a functional capacity examination, a primary care examination, and a neuropsychological examination, as well as that the Executive Committee be afforded the opportunity to communicate directly with the individuals performing these examinations, as well as with Drs. Weissglass and Lowery. Plaintiff would also



need to perform a C-section under direct observation at St. Francis. Plaintiff was asked to indicate whether he accepted these requests, and if he did, the MEC requested these steps be accomplished within sixty days. Plaintiff was further advised that if he did not reply within the specified time (by July 29, 2013), that the Executive Committee would deem that as a rejection of this request, and that in that event, the Executive Committee would proceed to consider Plaintiff's request for reinstatement. Finally, Plaintiff was advised that if the Executive Committee decided not to grant Plaintiff's request to return from voluntary medical leave, he would be entitled to the rights provided in Article XI of the medical staff bylaws, which would include a right to a hearing and a right to appeal the decision to the Board of Directors. See Defendants' Exhibit (Court Docket No. 109-19, pp. 19-24).

The evidence presented to the Court indicates that Plaintiff accepted the MEC's proposal (although he also continued with this lawsuit), and that over the following months he and the MEC went back and forth regarding what information Plaintiff had provided, what was or was not still lacking, and where both sides believed they were in the process. See Defendants' Exhibit (Court Docket No. 109-19, pp. 25-44). This process culminated in Plaintiff appearing before the MEC and making a presentation (apparently in December 2013), following which Plaintiff was notified of what the MEC believed remained to be completed. See Defendants' Exhibit (Court Docket No. 109-19, pp. 45-48). However, Plaintiff argued in a letter dated March 3, 2014, that he believed he was fully in compliance with the MEC's requirements to consider his application to return from medical leave. See Defendants' Exhibit (Court Docket No. 109-19, pp. 49-50).

Plaintiff's application for reinstatement was thereafter denied by the MEC. See Defendants' Exhibit (Court Docket No. 109-19, 51-53). The MEC's letter notifying Plaintiff of this



event set forth the grounds for the denial of Plaintiff's application, notified him that he had thirty days in which to file a written request for a hearing, and that if he failed to request a hearing as specified therein, Plaintiff would be deemed to have waived any right to a hearing and to an appellate review. Plaintiff was further notified that if he did timely request a hearing, a hearing would be scheduled before the MEC within fifteen days, and that Plaintiff would be notified of the time, place, and date of the hearing, which would be not less than thirty days and not more than forty-five days from the date of the hearing notice. Id. See also § 11112(b).

On November 12, 2014, Plaintiff was sent a special notice stating that he had failed to timely request a hearing concerning the MEC's decision to deny his request to return from medical leave, that the Board of Directors of the hospital had thereafter considered the decision and recommendation of the MEC at their meeting on June 4, 2014, and that the Board had accepted the MEC's recommendation that Plaintiff's request be denied, and had denied his request. Plaintiff was further notified, however, that as his medical staff category remained active, he could make an additional request to return from medical leave at any time. See Defendants' Exhibit (Court Docket No. 109-19, 55-56).

In sum, even after Plaintiff had filed this lawsuit, it is readily apparent that he continued with the administrative process at the hospital, and while there is a dispute between the parties as to whether Plaintiff provided sufficient medical findings and evidence to meet the requirements of the MEC[17], even assuming this evidence is relevant to the claims Plaintiff asserts in

---

[17]However, one thing is not in dispute. While Plaintiff contends that the medical records and findings he provided were sufficient for the MEC to reach a final decision on his claim, it is clear in the materials provided to this Court that Plaintiff never fully complied with the requests made by the MEC, instead choosing to provide evidence that *he believed* satisfied the hospital's need for

(continued...)



this lawsuit (since it all post-dates Plaintiff having filed this lawsuit), there is nothing in this evidence to rebut the presumption that the peer review action at issue complied with the necessary standards for the granting of immunity under the HCQIA. Wieters, 58 Fed.Appx. at 45 [affirming summary judgment where the claimant physician "failed to rebut the presumption of the HCQIA that the hospital complied with its requirements"]. Therefore, the Defendants are entitled to summary judgment on Plaintiff's remaining state law causes of action (Second, Fifth, Eighth, and Ninth Causes of Action) wherein Plaintiff seeks monetary damages against the Defendants, as these causes of action all derive out of the actions taken by the Defendants against the Plaintiff as a result of the peer review activities discussed herein. Oksanen, 945 F.2d at 704; [The purpose of the HCQIA is to grant peer reviewers immunity so as to encourage physicians to engage in peer review and take actions (to include suspension and revocation of privileges) to protect patients without fear of reprisal in the form of suits seeking monetary damages]; Moore, 560 F.3d at 171 [Pursuant to 42 U.S.C. § 1111(a)(1), if a professional review action of a professional review body meets all of the standards set forth in 42 U.S.C. § 11112(a), the professional review body, as well as any person participating in or assisting or acting as a member or staff of the professional review body, *shall not be* liable for damages under any law of the United States or of any State with respect to that action].

**Alternative basis for dismissing Plaintiff's State law claims (other than Second Cause of Action for abuse of process[18]).** In his Fifth Cause of Action, Plaintiff alleges that the

---

[17](...continued)
information.

[18]Plaintiff's Second Cause of Action, for abuse of process, relates solely to the process used in his professional peer review, and as such is clearly covered by the immunity provided under the HCQIA, which applies to professional review actions based on a physician's "competence or
(continued...)



Defendants tortuously interfered with his contract with the Fetter Health Center, pursuant to which he referred patients to St. Francis. Plaintiff alleges that after his medical staff privileges were suspended, the Defendants sought to have others at St. Francis substitute services for those which Plaintiff had a right to provide Fetter Health Center Patients pursuant to his contract with the Fetter Health Center. Plaintiff alleges that this interference was unjustified because it was based on his "illegal forced medical leave". This claim fails because, for the reasons already discussed hereinabove, supra, Plaintiff has not presented evidence sufficient to establish that the Defendants' actions with respect to his staff privileges were without justification or were for an improper purpose, and the Fourth Circuit has held that the fact that a hospital "observed HCQIA's safeguards of procedural fairness blunts Plaintiff's claim that any interference with possible contractual relationships was somehow tortuous". Moore, 560 F.3d at 176-177.

As for Plaintiff's Eighth and Ninth Causes of Action, wherein Plaintiff alleges that the Defendants engaged in a civil conspiracy to take away his medical staff privileges for their own economic gain and to profit their employers, this claim fails because a civil conspiracy must involve two or more legal entities and the Defendants are one legal entity when engaging in peer review. Moore, 560 F.3d at 178; Oksanen, 945 F.2d at 702-703 [Staff members act as agents of the hospital during peer review].

---

<sup></sup>18(...continued)
professional conduct"; 42 U.S.C. § 11151(9); and is meant to be an "incentive and protection for physicians engaging in effective professional peer review". Id., at § 11101(5). Therefore, discussion of an alternative basis for dismissal of this claim is not warranted.



**<u>Conclusion</u>**

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment with respect to Plaintiff's First Cause of Action under Title III of the ADA be **denied**. Defendants' motion for summary judgment on Plaintiff's pendant state law claims should be **granted** for the reasons stated. If the Court adopts this Recommendation, St. Francis will be the only remaining Defendant.

The parties are referred to the Notice Page attached hereto.

Bristow Marchant
United States Magistrate Judge

May 21, 2015
Charleston, South Carolina

41

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

